# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**ROBERT E. TAYLOR,**

        **Plaintiff,**

**-vs-**                              **Case No.  6:07-cv-1023-Orl-22KRS**

**COMMISSIONER OF SOCIAL SECURITY,**

        **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration without oral argument on the Complaint filed by Robert E. Taylor, seeking review of the final decision of the Commissioner of Social Security denying his claim for social security benefits.  Doc. No. 1.  The Commissioner answered the Complaint and filed a certified copy of the record before the Social Security Administration (SSA).  Doc. Nos. 8, 10.

**I.    PROCEDURAL  HISTORY.**

In January 27, 2004, Taylor applied for benefits under the Supplemental Security Income for Aged, Blind and Disabled program ("SSI"), 42 U.S.C. §§ 1382, *et seq*. (sometimes referred to herein as the Act).  He alleged that he became disabled on January 3, 2001.  R. 77.  Taylor's application was denied initially and on reconsideration. R. 34-37, 46-48, 50-51, 55-56.

Taylor requested a hearing before an administrative law judge (ALJ). R. 41. An ALJ held a hearing on October 18, 2005. Taylor, represented by an attorney, testified at the hearing. Donna Mancini, a vocational expert (VE), also testified. R. 365-95.

The ALJ found that Taylor had not engaged in substantial gainful activity since the alleged onset date of his disability. R. 20.

The ALJ concluded that the medical evidence showed that Taylor had depression and anxiety. R. 20. These impairments did not meet or equal any of the impairments listed in the applicable social security regulations (the Listings).[1] R. 22.

The ALJ concluded that Taylor had the residual functional capacity (RFC) to perform a significant range of all exertional work, and is limited to simple, unskilled work that requires only occasional contact with coworkers and the general public, work that is generally isolated with only occasional supervision, and work that is low stress, defined as requiring only occasional decision making or judgment. R. 23. She concluded that Taylor had mild to moderate restrictions of activities of daily living, moderate restrictions of social functioning, a moderate impairment in his ability to concentrate, and no extended episodes of decompensation. R. 22-23.

She also found Taylor's claimed limitations were not entirely credible and were exaggerated. R. 23-24. In reaching this conclusion, the ALJ relied on Dr. Graham's finding that Taylor had no problems in attention, concentration, or recent and remote

---

[1] The Code of Federal Regulations "contains a Listing of Impairments specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories." *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

memory. R. 23. Dr. Graham noted that Taylor was vague in his description of his alleged panic attacks. R. 24. She noted record evidence that Taylor could walk regularly to the store, visit with friends at his house, drive with his mother to pick up his son for visitation, and go hunting in another state with his brother, all of which were inconsistent with his reports of debilitating panic attacks. R. 25.

The ALJ found that Taylor had no past relevant work. R. 26. Based on the testimony of the VE, the ALJ found that there were jobs that existed in significant numbers in the national economy that Taylor could perform given his age, education, work experience and RFC. R. 27. Therefore, the ALJ concluded that Taylor was not disabled. *Id*.

Taylor requested review of the ALJ's decision. R. 9-14. On April 24, 2007, the Appeals Council issued a decision finding no basis to review the ALJ's decision. R. 3-5. Taylor timely sought review of this decision by this Court. Doc. No. 1.

**II.     JURISDICTION.**

As the plaintiff has exhausted his administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

**III.    STATEMENT OF FACTS.**

Review of the entire record reflects that the facts are adequately stated in the ALJ's decision and in the parties' memoranda. Accordingly, I will only summarize the pertinent facts to protect Taylor's privacy to the extent possible.

Taylor was 38 years old as of the alleged onset date of his disability. R. 369. He went to the tenth grade in school but did not complete that grade. R. 370. He had not worked for some time. R. 371, 388. His mother and brother supported him. R. 372.

Taylor testified that he was admitted to a mental institution for depression or anxiety on two occasions in the early 1990s with stays of three days and one week. R. 373. More recently, he began treatment at the ACT Corporation. On January 25, 2000, Robert Deeb, M.D., saw Taylor following a fight four days earlier. R. 235. He noted that Taylor's thoughts were free from psychotic processes, he had a calm mood, and Taylor denied suicidal or homicidal ideation or intent and substance abuse. R. 235. Dr. Deeb diagnosed bipolar II disorder and panic disorder and assessed Taylor with a Global Assessment of Functioning ("GAF") score of 60.[2]

On January 21, 2002, a psychologist or psychiatrist, whose signature is illegible, prepared a Treating Psychiatrist/Psychologist Mental Health Report. The doctor wrote that Taylor's mood and affect were flat and blunted, his concentration was poor, and his memory was fair. R. 163. The diagnosis was major depression, recurrent. R. 164.

On June 28, 2002, Malcolm J. Graham, Ph.D., conducted a consultative clinical evaluation. R. 179-83. Dr. Graham noted that Taylor had a history of polysubstance abuse. R. 180, 182. Dr. Graham found that Taylor was not depressed, but appeared

---

[2] The Global Assessment of Functioning (GAF) scale is used to report an individual's overall level of functioning. HAROLD I. KAPLAN, M.D. & BENJAMIN J. SADOCK, M.D., SYNOPSIS OF PSYCHIATRY 299 (8th ed. 1998) (hereinafter SYNOPSIS OF PSYCHIATRY). A score between 51 and 60 is defined as: "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.*

somewhat anxious. His affect was appropriate. Testing revealed Taylor did not have any concentration, attention, or memory problems. He was oriented to time, place and person. R. 181-82. Further, Taylor was able to "relate information in a rational, coherent, and sequential fashion" and there was no indication of hallucinations or other perceptual disturbances. R. 181. Dr. Graham diagnosed Taylor with probable alcohol induced anxiety disorder, probable antisocial personality disorder, and a "bi-polar disorder by report" with a GAF score between 65 and 75.[3] R. 181-82.

On July 15, 2002, Susan Conley, Ph.D., a state agency psychological consultant, reviewed Taylor's medical records. She concluded that Taylor had only mild difficulties in social functioning, and moderate limitations in activities of daily living, and concentration, persistence, and pace. R. 201. Dr. Conley opined that Taylor would be moderately limited in the ability to carry out detailed instructions, to maintain attention and concentration for extended period, and to set realistic goals or make plans independently of others. R. 184-85. He would also be moderately limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms.

On March 7, 2003, Taylor told Jane Darci, A.R.N.P., that he had panic attacks and stayed in his room because he was unable to go out in public alone. R. 234. Darci

---

[3] A GAF rating between 61 and 70 reflects: "Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." SYNOPSIS OF PSYCHIATRY 299. Scores between 71 and 80 indicate that if symptoms are present, they are transient and expectable reactions to psychosocial stressors. There should be no more than slight impairments in social, occupational, or school functioning. *Id*.

observed that Taylor had fair attention, concentration, insight, and judgment, and normal impulse control and orientation.  *Id*.  Darci noted that Taylor did not have any psychotic thoughts, but his affect was blunted, and he had suicidal or homicidal thoughts with no intent or plan to carry them out.  *Id*.  He was treated with medication.  R. 233.

On March 19, 2003, Taylor reported that his medication helped his anxiety, but he was still depressed and fatigued.  R. 206.  On April 7, 2003, Dr. Deeb opined that Taylor was somewhat reclusive, but had good concentration and attention and a normal mood.  R. 231.  He also noted that Taylor had normal speech and non-psychotic thoughts, including no suicidal or homicidal thoughts.  *Id*.  The diagnosis remained unchanged in April 2003.  R. 231.

On October 6, 2003, Taylor told Darci that he felt depressed with decreased motivation and energy.  R. 226.  Darci observed that his memory was poor and his concentration was fair to poor.  R. 227.  He was cooperative; his speech was coherent; his thoughts were nonpsychotic without any suicidal or homicidal thoughts; his insight, impulse control, and judgment were all fair.  *Id*. at 227-28.  His mood was only "slightly blunted/ depressed."  *Id*. at 227.  Darci opined that Taylor had a GAF score of 45.[4]  R. 228.  Darci concluded that Taylor had a "good" prognosis.  R. 230.

On November 10, 2003, Darci noted that Taylor had increased energy and was helping out around the house more frequently, sleeping well, and was "being out around people more."  R. 223.  Darci also stated that Taylor's impulse control was fair; he was

---

[4] A GAF score between 41 and 50 is defined as serious symptoms or any serious impairment in social, occupational, or school functioning.  SYNOPSIS OF PSYCHIATRY 299.

alert and oriented; his thought process was non-psychotic without any suicidal or homicidal thoughts; and he had an intact memory. *Id*. His GAF score was 50. R. 223.

On January 15, 2004, Darci found that Taylor had fair attention, concentration, insight, judgment, and impulse control without any psychotic thoughts. He reported an increase in panic attacks. R. 222. On February 23, 2004, Darci stated that Taylor had poor insight, judgment, and impulse control, but fair attention and concentration and non-psychotic. He had been out of medication for one week. R. 300-01. Taylor was having suicidal thoughts without any plan or intent. *Id*. His GAF score was 45. R. 221.

On March 18, 2004, Darci prepared a Treating Source Mental Health Report. She described Taylor's concentration and memory as poor, and he had suicidal thoughts. R. 268-69. He reported a great deal of difficulty being around people. R. 269. Darci noted that Taylor did not react well in stressful situations. R. 269.

On April 30, 2004, Dr. Graham re-evaluated Taylor. R. 270-73. Taylor complained of depression and panic attacks that lasted all day. R. 270-71. Dr. Graham noted that he was "very vague and evasive when discussing the specifics of his panic attacks." R. 271. Dr. Graham found no indication of a depressed or anxious mood, and found that Taylor was oriented, had normal concentration and memory based on testing, and could relate information in a rational, coherent, and sequential fashion. R. 271-72. He opined that Taylor had a GAF score between 65 and 75 and appeared to be exaggerating many of his psychological symptoms. R. 273. Dr. Graham could not definitively diagnosis malingering without the results of the Minnesota Multiphasic Personality Inventory (MMPI-II). *Id*.

On May 25, 2004, Dr. Conley once again evaluated Taylor based on his medical records. R. 274-90.  She concluded that Taylor was moderately limited in activities of daily living, social functioning and maintaining concentration, persistence and pace. R. 284.  Specifically, he would have moderate limitations in understanding, remembering and carrying out detailed instructions, setting realistic goals, and making plans independently of others.  He would be moderately limited in working in coordination or proximity with others and reacting appropriately with the general public.  He would also have moderate limitations in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms.  R. 288-89.

In July 2004, Taylor sought emergency room treatment for chest pain.  R. 337. The diagnosis was anxiety.  R. 339.

On August 31, 2004, Dr. Mark Williams, a state agency psychological consultant, reviewed Taylor's medical records and found he only had non-significant to moderate limitations.  R. 318-20.  Dr. Williams concluded that Taylor had only mild limitations in activities of daily living, but moderate limitations in maintaining social functioning and concentration, persistence and pace.  R. 332.  Specifically, he was moderately limited in the ability to understand, remember and carry out detailed instructions, to set realistic goals, and to make plans independently of others.  He was also moderately limited in the ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism.  R. 319-20.

On October 22, 2004, Taylor told Carolyn Stewart,[5] a board certified A.R.N.P., that he was very depressed with no motivation, that he panicked when he knew he had to leave the house, that he had daily anxiety attacks, and mild mood swings with lots of anger and irritability. R. 351. Upon examination, Stewart found that Taylor's attention, concentration, thoughts, and impulse control were all normal. She assessed his GAF score at 45. *Id.*

On December 10, 2004, Taylor told Stewart that his medication had helped a lot, but that he still experienced panic attacks in crowds. R. 350. He reported that he was more awake during the day, and that he recently made a trip to Georgia to go hunting with his brother. *Id*. Stewart found that Taylor's attention, concentration, impulse control, thought content, insight, judgment, and memory were all normal. Taylor denied any suicidal or homicidal thoughts. *Id*.

Approximately a month later, on January 21, 2005, Taylor told Stewart that medication helped with his motivation and that he had done his laundry and cooked dinner a couple of times. R. 349. Taylor reported that he still had days he could not get out of bed, but that these episodes were becoming less frequent. *Id*.; *accord* R. 374.

On March 18, 2005, Taylor reported to Stewart that he felt depressed and had panic attacks when around people. R. 348. Stewart found that he had good attention, concentration, and memory, normal impulse control, organized thoughts, and fair insight and judgment without any suicidal or homicidal thoughts or plans. *Id*.

---

[5] Mistakenly referred to as "Carolyn Steward" in the ALJ's decision and Plaintiff's brief. See R. 24; Doc. No. 13.

On October 17, 2005, Stewart completed a Mental RFC Assessment in which she opined that Taylor had moderate limitations in his ability to understand and remember, and marked limitations in sustained concentration and persistence, social interaction and most facets of adaptation. R. 363-65. Stewart opined that Taylor was unable to work because of his panic disorder with agoraphobia, and his inability to be around crowds and strangers. She wrote that special arrangements had been made for his office visits to that he could arrive when the waiting room was empty. R. 365.

At the hearing, Taylor testified that his biggest health problems are depression and panic attacks. R. 372. In an average week, he had two anxiety or panic attacks a day. R. 376-77. It took a couple of hours to recover from an anxiety attack, but all day to recover from a panic attack. R. 377. When having such attacks, his mind races, his chest and arm hurt and he cannot breathe. *Id.* He also had difficulty concentrating. R. 371.

Taylor testified that he slept 16 to 18 hours a day at least three days each week. R. 381-82. He sometimes helped his mother with household chores. R. 383. He was able to do the laundry. R. 383. He had friends who visited him from time to time. R. 384. About three times a week, he walked to a store to buy cigarettes. R. 384. He rode with his mother to pick up his six-year-old son for visitation every other weekend. R. 385. He was able to play with and care for his son. R. 385-86.

**IV.     STANDARD OF REVIEW.**

To be entitled to disability benefits under SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the following criteria, in sequence:

> (1) Is the claimant presently unemployed?
>
> (2) Is the claimant's impairment severe?
>
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
>
> (4) Is the claimant unable to perform his or her former occupation?
>
> (5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. § 416.920(a)(4).  An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative

answer leads to a finding of "not disabled."  *See, e.g., McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits."  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform."  *Id*. at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210.  "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision."  *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Where the SSA's decision is supported by substantial

evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id*.

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

**V.    ANALYSIS.**

Taylor argues that the ALJ made several errors. First, that the ALJ failed to state what weight, if any, that he gave to the evaluation of ARNP Darci and erred in according little weight to the opinion of ARNP Stewart. Second, Taylor argues that the ALJ relied on her own medical opinions regarding the evidence. Finally, Taylor argues that the ALJ erred in failing to obtain an updated expert opinion.

A.    The ALJ's Treatment of the Opinions of the Nurse Practitioners.

Taylor complains that, although the ALJ referenced Darci's reports in her decision, the ALJ failed to state what weight, if any, she gave to Darci's opinions. He also argues

-13-

that the ALJ erred by giving little weight to Stewart's opinion set forth in the Mental RFC Assessment dated October 17, 2005, in which she found that Taylor had marked limitations in several functional areas. The Commissioner argues that because nurse practioners are not "acceptable medical sources" for medical opinions, the ALJ did not err in her analysis of the nurse practitioners' opinions.

Acceptable medical sources include licensed medical or osteopathic doctors, licensed or certified psychologists, licensed optometrists, licensed podiatrists and qualified speech-language pathologists. 20 C.F.R. § 416.913(a). Only the opinions of acceptable sources can establish the existence of an impairment. *See Crawford v. Comm'r*, 363 F.3d 1155, 1159 (11th Cir. 2004).

The regulations also address the use of information from "other sources," both medical and non-medical. *See* 20 C.F.R. § 416.913(d). Other medical sources include nurse practitioners, physicians' assistants, and therapists. These sources, as well as the other non-medical sources, may provide evidence "to show the severity of [a claimant's] impairment(s) and how it affects [a claimant's] ability to work." *Id.*

After the ALJ rendered her decision in this case, the agency promulgated Social Security Ruling 06-03p to "clarify how [it] consider[s] opinions from sources who are not 'acceptable medical sources[.]' " SSR 06-03p, 2006 WL 2329939, at *1. The Ruling states that "[o]pinions from these medical sources . . . are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.* at *3. The Ruling further specifies that the factors for weighing the opinions of acceptable medical sources set out in 20 C.F.R.

§ 404.1527(d) and § 416.927(d) apply equally to "all opinions from medical sources who are not 'acceptable medical sources' as well as from 'other [non-medical] sources.' " *Id.* at *4. The Ruling instructs the adjudicator to "explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at *6.

Nurse practitioners Darci and Stewart reached similar conclusions regarding Taylor's GAF score and ability to function. Stewart translated those findings into an RFC assessment of the type commonly used in evaluating mental functional limitations in social security cases. Because the opinions of the two nurse practitioners were essentially cumulative, there was no error in the ALJ's failure to specifically discuss the weight given to Darci's opinions. *See Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005)("There is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision.").

With respect to Stewart's opinion, the ALJ reasoned as follows:

> The opinion of this individual, who assessed the claimant with extreme limitations, is not afforded a great deal of weight as this opinion is not from a physician or psychologist and the opinion conflicts with the substantial evidence of record, documenting less severe limitations. . . . Furthermore, this opinion appears on a fill-in-the-blank form, with only marginal notes attached to it. Such reports unaccompanied by a thorough written report have been determined by the courts to be weak evidence and their reliability is suspect.

R. 25.

Initially, Taylor argues that the ALJ improperly discounted Stewart's opinion because she is not a physician or psychologist. R. 25. As noted above, however, the ALJ appropriately distinguished Stewart's opinion from that of an acceptable medical source, such as a physician or psychologist.

Taylor argues that the ALJ's finding that Stewart's opinion "conflicts with the substantial evidence of record" is legally insufficient because the ALJ failed to state what evidence is in conflict. The ALJ's opinion reflects that she did state the evidence in conflict as follows: "[T]he claimant can walk regularly to a store to buy cigarettes, visit at his house with several friends, go hunting in another state with his brother, [and] drive with his mother to pick up his son for visitation. . . ." R. 25. The ALJ also noted evidence in the record that suggested that Taylor may have exaggerated his symptoms and limitations. R. 24. Thus, the opinion reflects that the ALJ considered Stewart's records and opinion and weighed Stewart's opinion against the other evidence of record. This was all the ALJ was required to do.

Finally, Taylor objects that it was improper for the ALJ to discount Stewart's opinion because she used a fill-in-the-blank form. Taylor points out that the form is one that is published by the SSA and that the reviews completed by the medical consultants also were the same check-box forms. *Compare* R. 288-291, 318-321 *with* R. 362-66. I agree that the ALJ acted inconsistently in the treatment of the information based on the use of check-box forms. This error is harmless, however, as the ALJ's decision adequately explains the substantive reasons that the ALJ did not credit Stewart's RFC assessment.

      B.     <u>Whether the ALJ Erred By Relying on Her Own Medical Opinions Regarding Taylor's Condition</u>.

Taylor argues that the ALJ erred by relying on her observations of Taylor's conduct at the hearing, and the daily activity questionnaires he prepared, rather than the medical opinions of record.  The Commissioner contends that there was no error because the ALJ did not rely solely on her own opinion.

The law is clear that an ALJ may not substitute her judgment of a claimant's condition for that of the medical and vocational experts because a claimant fails to manifest certain traits at a hearing.  *Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982).  That does not mean, however, that the ALJ is prohibited "from considering the claimant's appearance and demeanor during the hearing."  *Norris v. Heckler*, 760 F.2d 1154, 1158 (11th Cir. 1985).  So long as the ALJ "does not reject the objective medical evidence and claimant's testimony solely upon his observation during the hearing," it is not error to consider the claimant's demeanor among other criteria.  *Id*.

The ALJ's decision discusses the medical evidence that she relied on in finding that Taylor is able to concentrate sufficiently to perform simple tasks.  The ALJ gave "significant weight" to the opinions of Dr. Graham, Dr. Conley, and Dr. Williams.  R. 26.  Dr. Graham reported no problems with Taylor's attention and concentration when he examined Taylor on April 30, 2004.  R. 23.  Drs. Conley and Williams both opined that Taylor was only moderately limited in maintaining concentration, persistence or pace.  R. 25.  The ALJ's observations provided additional support for her conclusions, but did not supplant the opinions of the physicians and other evidence of record.

      C.    <u>Whether the ALJ Erred in Failing to Obtain an Updated Medical Expert Opinion</u>.

Taylor argues that Stewart's opinion that Taylor had marked limitations in several functional areas as of October 2005, should have resulted in the ALJ ordering updated opinions from the consulting and reviewing physicians regarding Taylor's mental RFC. Taylor relies on Social Security Ruling 96-9p in support of that argument. SSR 96-9p, 1996 WL 374180 (S.S.A. July 2, 1996) (hereafter "SSR 96-6p").

SSR 96-6p requires the ALJ to obtain an updated medical opinion from a medical expert "when additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." *Id*. at *3-4. In this case, as discussed above, the ALJ did not accord much weight to Stewart's opinion. The Court can infer, therefore, that the ALJ did not believe that Stewart's opinion might cause the consulting and reviewing physicians' medical opinion to change regarding whether Taylor's impairment met or equaled the Listings. Therefore, the ALJ did not err in failing to obtain an updated medical expert opinion.

## VI. RECOMMENDATION.

For the reasons set forth above, I respectfully **RECOMMEND** that the decision of the Commissioner be **AFFIRMED.**  I further **RECOMMEND** that the Court direct the Clerk of Court to issue a judgment consistent with this recommendation and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on June 26, 2008.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Courtroom Deputy